IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2026 Session

## STATE OF TENNESSEE v. AMANDA JEAN PHILLIPS

**Appeal from the Criminal Court for Scott County**
**No. 11672A  Zachary R. Walden, Judge**

_____

### No. E2025-00327-CCA-R3-CD

_____

The Defendant, Amanda Jean Phillips, was convicted by a Scott County jury of aggravated assault with a deadly weapon, a Class C felony; two counts of especially aggravated kidnapping, a Class A felony; two counts of aggravated child neglect of a child eight years of age or less, a Class A felony; and carjacking, a Class B felony. The trial court sentenced the Defendant to four years for the aggravated assault conviction, twenty years for each of the especially aggravated kidnapping convictions, twenty years for each of the aggravated child neglect convictions, and ten years for the carjacking conviction. Finding the Defendant to be a dangerous offender, the trial court ordered partial consecutive sentences for an effective total sentence of thirty years at 100% service in the Tennessee Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence in support of her aggravated child neglect convictions and argues that the trial court erred by not considering a mandatory mitigating factor in imposing her especially aggravated kidnapping sentences and by classifying her as a dangerous offender under the consecutive sentencing statute. We conclude that the evidence is sufficient to support the Defendant's convictions for aggravated child neglect and that the trial court did not err in its application of enhancement and mitigating factors but failed to make adequate findings in support of consecutive sentencing under the dangerous offender criterion of the consecutive sentencing statute. However, upon de novo review, we conclude that the record supports the imposition of consecutive sentences based on the Defendant's having committed the offenses while she was on probation. Accordingly, we affirm the Defendant's convictions and the sentences imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN J. SWORD, JJ., joined.

Mitchell A. Raines, Assistant Public Defender-Appellate Division, Franklin, Tennessee (on appeal); and David A. Stuart, Clinton, Tennessee (at trial), for the appellant, Amanda Jean Phillips.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Jared Effler, District Attorney General; and Apryl C. Bradshaw and Thomas E. Barclay, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to the Defendant's March 24, 2020 theft of a vehicle with two children inside. According to the State's proof at trial, the children's mother ("Mother")[1], who had left her young sons in their car seats as she stepped inside a Mexican restaurant in Oneida to pick up a to-go order, saw the Defendant peering into the window of the passenger side rear seat of Mother's vehicle, where Mother's two-year-old son, J.P., was sitting. Initially believing that the Defendant was a concerned citizen, Mother went outside and told the Defendant that she was the mother, and that the children were fine. Instead of responding, the Defendant walked to the driver's side of the vehicle and opened the driver's side rear door where Mother's five-year-old son, K.F., was sitting.

As Mother went to the vehicle, the Defendant shut the rear door and opened the driver's door. Realizing that the Defendant was stealing her vehicle, Mother screamed that they were her children and begged the Defendant to please stop. The Defendant looked at Mother, laughed, jumped in the driver's seat, and quickly reversed the vehicle before driving forward with Mother chasing on foot. The Defendant stopped momentarily to let her brother, Brandon Cody Phillips ("Codefendant Phillips"), into the front passenger seat. Mother caught up, opened the passenger side rear door, and attempted to get inside but was knocked off her feet by the movement of the vehicle. Mother hung onto the door handle, despite being dragged, as the Defendant sped down the street. When the door handle broke off, Mother ran back to the restaurant, and the restaurant owner called 911.

A customer of the restaurant used the "Find my iPhone" application to track the movement of Mother's iPhone inside the vehicle as Mother and the restaurant owner relayed those directions to the 911 dispatcher. Within a few minutes, a police officer found the children inside Mother's abandoned vehicle behind a downtown Oneida business. The

---

[1] To preserve the privacy of the victims, we refer to the children by their initials only, and the children's mother as "Mother."

Defendant and Codefendant Phillips were identified as the perpetrators and indicted together for the especially aggravated kidnapping of the children, the aggravated neglect of the children, the aggravated assault of Mother, and carjacking.

## Trial

Terri Mills, the owner of Mi Rancho Mexican restaurant in Oneida, testified that in March 2020, her restaurant could only process to-go orders due to the Coronavirus pandemic. Because the restaurant did not have a drive-through window, customers had to come inside the restaurant to pick up their orders, and the number of customers allowed inside at one time was limited.

On the evening of March 24, 2020, Mother, a regular customer, placed an order. Mother called again to ask if the order was ready, and Ms. Mills told her it was. It was raining, and Ms. Mills met Mother at the restaurant door with the order. Mother's vehicle was parked directly in front of the restaurant's glass front door. Mother stepped about two feet inside the restaurant to get her order and kept looking over her shoulder at her vehicle. As Mother was leaving the restaurant, Ms. Mills turned to answer a telephone call. Almost immediately, Ms. Mills heard Mother screaming, "Please stop[,]" and that her children were in the vehicle. When Ms. Mills looked outside, she saw Mother being dragged down the street by Mother's vehicle.

Ms. Mills testified that Mother came running back inside the restaurant holding the broken door handle and screaming for Ms. Mills to call 911. Mother's hands were bleeding, and she had scrapes down the side of her body. Ms. Mills called 911 with the phone set on speaker phone, and she and Mother together relayed the movements of Mother's vehicle as another restaurant customer used the "Find my iPhone" application on the customer's iPhone to track Mother's iPhone inside the vehicle.

Mother, an office manager at a nursing home, testified that she picked up J.P. and K.F. from their babysitter at approximately 5:30 p.m., placed a to-go order with Mi Rancho, drove to the restaurant, and parked in front of the door. She said that K.F. wanted to FaceTime with his father in Kentucky, and she handed him her cell phone to make the call while she went into the restaurant. As she was about to walk out of the restaurant, she saw the Defendant approach her vehicle, rub the fog off the rear passenger side window where J.P. was sitting, and peer inside. Under the impression that the Defendant was a concerned citizen checking on the children, she went outside and told the Defendant that she was the mother, and that the children were fine.

Mother testified that the Defendant walked around the vehicle and opened the rear door on the driver's side where K.F. was sitting. Mother could hear her children saying,

- 3 -

"Mommy, Mommy" and then, "Not Mommy." As Mother hurried to her vehicle, she repeated that the children were hers, and that they were fine. The Defendant shut the rear door and opened the driver's door. Mother realized that the Defendant was stealing her vehicle and began screaming, "My kids are in the car. My kids are in the car." The Defendant looked at Mother, laughed, got into the driver's seat, and reversed the vehicle with the driver's door open.

Mother testified that she had reached the front of the vehicle but was blocked by the open driver's door. She said that she attempted to hang onto the driver's door and continued screaming that her children were in the vehicle. At the same time, Mother could hear her children screaming inside the vehicle. When the Defendant began driving forward, Mother stood in front of the vehicle. The Defendant swerved to avoid her, and Mother began chasing after the vehicle. Mother said that she was able to grab the front passenger side door handle, but it slipped from her grasp.

Mother testified that the Defendant stopped, and Mother for the first time saw Codefendant Phillips coming on foot around a building and running toward the vehicle. Mother stated that she was still screaming that her children were in the vehicle. For that reason, she at first thought that Codefendant Phillips was a bystander coming to help. However, the Defendant called to Codefendant Phillips to get in, and Codefendant Phillips, after a slight hesitation, got into the front passenger seat. In the meantime, Mother caught up to the rear door on the passenger side, opened it, and saw her two-year-old crying. The movement of the vehicle caused the rear door to shut, knocking Mother off her feet. Mother stated that the Defendant "[d]rove really fast."

Mother testified that she clung to the rear door handle, determined to stay with her children. She said she was dragged down the street until the handle broke off and she fell into a pothole in the street. She then ran back to the restaurant, where Ms. Mills called 911 and Mother contacted her fiancé's family, who in turn contacted Mother's fiancé. Mother testified that when her fiancé arrived at the restaurant, the customer tracking Mother's iPhone got into the fiancé's truck to help him find Mother's vehicle.

Mother testified that when she arrived at the location where her vehicle had been found, her fiancé was removing J.P. from his car seat, and K.F., who was wet from the rain and shaking, was standing on the rear floorboard wearing a police officer's jacket. She said that K.F. told her that he had gotten out of the vehicle because he wanted to know where the "bad guys went" so that he could tell the police officers.

Mother testified that both children, but especially K.F., were traumatized by the episode. The children had only recently returned to sleeping in their own beds and K.F., at the time of trial, continued to express fear that the "bad people" would return to get him.

Mother stated that she scheduled counseling for K.F. but did not follow through due to the difficulty of coordinating with K.F.'s father, who had shared custody.

Mother's husband, who at the time of the incident had been Mother's fiancé, testified that he and the restaurant customer followed the movement of Mother's vehicle as it traveled the streets of Oneida, with the customer giving him step-by-step directions on which way to turn. The vehicle eventually stopped, and he located it in a gravel drive behind First National Bank, arriving at approximately the same time as a police officer.

Officer Chad Jones of the Oneida Police Department testified that when he arrived at the location of Mother's stopped vehicle, he opened the passenger door and found the children inside. J.P. was still in his car seat, but K.F. was standing in the seat with "a very scared look on his face." When K.F. saw him, K.F. "c[a]me straight" into his arms and began crying. He asked K.F. where the defendants were, and K.F. pointed out the direction they had gone. Officer Jones testified that he found the vehicle and the children less than five minutes after the time he began following the coordinates relayed by the dispatcher.

Aleisha Byrd, a former 911 dispatcher with the Oneida Police Department, identified a copy of the 911 recording, which was published to the jury and admitted as an exhibit. Ms. Byrd testified that the first two dispatchers who could be heard on the 911 call were county dispatchers. Ms. Byrd stated that she was patched in at the four-minute mark. According to her computer-aided dispatch report, the Oneida police officer was dispatched at 6:03 p.m., and the vehicle was located at 6:09 p.m.

At the conclusion of the State's proof, the trial court granted a judgment of acquittal on the carjacking count against Codefendant Phillips. Neither defendant testified at trial, and the only defense witness was a police officer called on behalf of Codefendant Phillips, whose testimony is not relevant to the issues raised in this appeal. Following deliberations, the jury convicted the Defendant of all six counts as charged in the indictment.

## Sentencing Hearing

At the May 19, 2022 joint sentencing hearing, the State introduced the Defendant's presentence report, which reflected that the thirty-one-year-old Defendant had a significant history of criminal behavior beginning with a burglary conviction at the age of eighteen and including several drug-related convictions and an aggravated burglary conviction, for which the Defendant was on supervised probation at the time of the instant offenses. The presentence report further reflected that the Defendant had a long history of illegal drug use and scored a risk level of "high drug" on the validated risk and needs assessment.

Mother read a victim impact statement in which she described the traumatic and long-lasting effects the episode had on herself and her children. The Defendant, called as a witness on her codefendant's behalf, testified that as soon as Codefendant Phillips got in the vehicle and she and Codefendant Phillips realized children were inside, Codefendant Phillips grabbed the steering wheel and turned it to get her to stop. On cross-examination, she denied that she continued driving the vehicle or made any turns, testifying that they pulled off, Codefendant Phillips grabbed the steering wheel and turned it, and "that's when we got out."

The State argued for a total effective sentence of thirty years at 100% based on the application of six proposed enhancement factors and the imposition of discretionary consecutive sentences under three of the consecutive sentencing classifications: that the defendant was an offender whose record of criminal activity was extensive; that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high; and that the Defendant was being sentenced for offenses committed while the Defendant was on probation. *See* Tenn. Code Ann. § 40-35-115 (2), (4), (6). The Defendant argued that her quick abandonment of the vehicle with the children unharmed weighed against enhanced or consecutive sentences and proposed that a total effective sentence of eighteen to twenty years was reasonable under the facts and circumstances of the case.

The trial court found the following five enhancement factors applicable: the Defendant's history of criminal convictions and criminal behavior in addition to those necessary to establish her range; the Defendant's having acted as a leader in the commission of the offenses; that the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; that the Defendant had no hesitation in committing a crime where the risk to human life was high; and that the Defendant was on probation at the time of the offenses. *See* Tenn. Code Ann. § 40-35-114 (1), (2), (8), (10), (13)(C). The trial court found "little, if any" factors in mitigation, other than the Defendant's drug impairment at the time of the offenses. The trial court noted, however, that the Defendant's voluntary drug impairment did not excuse her behavior and found that this mitigation factor was entitled to little weight.

The trial court found that the Defendant's criminal record was insufficient to support discretionary consecutive sentencing and did not address whether the Defendant qualified for consecutive sentences based on her probationary status at the time of the commission of the offenses. The trial court found, however, that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime when the risk to human life was high. The trial court recited the factors required for imposing consecutive sentences under the dangerous offender classification:

And all three of the following factors out of *Wilkerson* progeny, this would apply - - the circumstances surrounding the offense or offenses was aggravated; I find that. The confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-social - - anti-societal lifestyle; I find that. And the aggr[ava]ted length of the sentence is - - reasonably relates to the offense of which the defendant stands convicted; I find that. This factor would support discretionary consecutive sentencing on these cases.

The trial court, therefore, sentenced the Defendant to twenty years at 100% for each of the especially aggravated kidnapping convictions, twenty years at 100% for each of the aggravated child neglect convictions, ten years at 75% for the carjacking conviction, and four years at 30% for the aggravated assault conviction. The trial court ordered that the especially aggravated kidnapping and aggravated child neglect sentences in counts two through five be served concurrently to each other, and the aggravated assault and carjacking sentences in counts one and six be served concurrently to each other but consecutively to the twenty-year sentences in counts two through five, for a total effective sentence of thirty years at 100% in the Tennessee Department of Correction.

Following the denial of her motion for new trial, the Defendant filed a timely notice of appeal to this court.[2]

## ANALYSIS

### I. Sufficiency of the Evidence

As her first issue, the Defendant challenges the sufficiency of the evidence in support of her convictions for aggravated child neglect. Specifically, the Defendant argues that there was no evidence that Mother's vehicle, as it was used in this case, was a dangerous instrumentality or that her actions adversely affected the health and welfare of the children. The State argues that the law of the case doctrine should preclude our

---

[2] The Defendant filed a previous appeal challenging the trial court's denial of her motion to "Set Aside, Amend and/or Correct Improper and Unlawful Judgments," which was based on the judgments having been entered without review by the Defendant's counsel and without notice to the Defendant's counsel of their entry. As a result, the Defendant failed to file a timely motion for new trial. This court held on direct appeal that we were without jurisdiction to grant relief. After granting the Defendant's Rule 11 application for permission to appeal, our supreme court reversed the judgment of this court and remanded to the trial court for entry of corrected judgments, with the Defendant allowed thirty days following the entry of the corrected judgments to file motion for new trial. *State v. Phillips*, No. E2022-01699-SC-R11-CD, 2024 WL 1711974 (Tenn. Apr. 18, 2024).

consideration of this issue, which was unsuccessfully raised by Codefendant Phillips in his separate direct appeal. In the alternative, the State argues that the evidence is sufficient to sustain the Defendant's convictions. We decline to apply the law of the case doctrine but agree with the State that the evidence is sufficient to sustain the Defendant's aggravated child neglect convictions.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

To sustain the convictions for aggravated child neglect, the State had to prove beyond a reasonable doubt that the Defendant knowingly neglected J.P. and K.F., children who were eight years of age or younger, so as to adversely affect their health and welfare and that she used a dangerous instrumentality to accomplish the neglect. Tenn. Code Ann. §§ 39-15-401(b), -402(a)(2), (b) (2019) (subsequently amended). "A 'dangerous instrumentality' is any item that, in the manner of its use or intended use as applied to a child, is capable of producing serious bodily injury to a child[.]" *Id.* at § 39-15-402 (d). A child's health and welfare are adversely affected "if the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 672 (Tenn. 2001). At the time of the offenses, Tennessee Code Annotated

section 39-15-401(g) provided that "[f]or the purposes of this section, 'adversely affect the child's health and welfare' may include, but not be limited to, the natural effects of starvation or dehydration or acts of female genital mutilation[.]"

The Defendant contends that the evidence did not show that she used a dangerous instrumentality against the children or that her actions adversely affected the children's health and welfare. The Defendant concedes that a vehicle may be a dangerous instrumentality in some circumstances but argues that it was not here because there was no evidence that the Defendant "ever used the vehicle to inflict an injury on the children." The Defendant relies on the inclusion of "the natural effects of starvation or dehydration or female genital mutilation" in Tennessee Code Annotated 39-15-401(g)'s definition of "adversely affects a child's health and welfare" to argue that "it is clear that adverse effects to health and welfare require more than the conduct at issue here."

Codefendant Phillips, in his separate appeal, also challenged the sufficiency of the evidence in support of his aggravated child neglect convictions by arguing, among other things, that the State failed to prove that the vehicle was a dangerous instrumentality or that the children's health and welfare were adversely affected. We rejected both arguments:

> We agree that the State established that the Defendant neglected the children so as to adversely affect their health and welfare. The Defendant abandoned the children in the car, where they were exposed to a variety of dangers, and the Defendant inflicted psychological damage to the children, which was reflected in the trial proof regarding how the children were traumatized by this incident. Because the record fully supports the detailed findings and conclusions made by the trial court, we conclude that the Defendant is not entitled to relief on this claim.

> Lastly, the Defendant contends that the State failed to prove beyond a reasonable doubt that he knowingly used or intended to use a dangerous instrumentality that was capable of causing serious bodily injury to the children. The trial court, in denying the motion for new trial, held that although the Defendant claimed that he did not use a dangerous instrumentality, "the evidence show[ed] that the process of stealing a car and abandoning very young children in the car meets the definition of [a] dangerous instrumentality because it is capable of producing serious bodily injury to a child, and the jury found as such." Here, because the car was driven recklessly and was used to separate the children from their mother, we agree with the trial court that the car met the definition of a dangerous instrumentality for the aggravated child neglect offense. Because the

evidence is sufficient to sustain the Defendant's two convictions for aggravated child neglect, he is not entitled to relief.

*State v. Phillips*, No. E2024-00418-CCA-R3-CD, 2025 WL 994693, at \*11 (Tenn. Crim. App. Feb. 24, 2025), *perm. app. denied* (Tenn. Sept. 11, 2025).

In this case, we, likewise, conclude that the State established that the Defendant neglected the children so as to adversely affect their health and welfare, and that she used a dangerous instrumentality to accomplish the neglect. Viewed in the light most favorable to the State, the evidence established that the Defendant stole a vehicle with a two-year-old and a five-year-old inside, who were screaming and crying as the Defendant accelerated from the restaurant with the children's mother initially clinging to the rear door handle and screaming for the Defendant to stop. The Defendant then abandoned the vehicle behind a downtown business, leaving young children alone as night was approaching.

The Defendant contends that there was no proof that she used the vehicle to inflict an injury on the children. She is mistaken. Although there was no physical injury to the children, the evidence at trial established that both children suffered mental trauma by the Defendant's actions. The evidence further established that the vehicle, driven recklessly by the Defendant and used to separate young children from their mother, met the definition of a dangerous instrumentality as an item that, in the manner of its use as applied to the children, was capable of producing serious bodily injury to the children. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's convictions for aggravated child neglect.

## II. Sentencing

The Defendant next contends that the trial court erred in sentencing by not considering a mandatory mitigation factor in determining the length of her especially aggravated kidnapping sentences and by imposing consecutive sentences under the dangerous offender classification without making adequate findings of fact.

This court reviews a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278 (Tenn. 2012). The abuse of discretion with a presumption of reasonableness standard is applied to decisions regarding the length, range and manner of service of a sentence "so long as [the sentence] is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. We review the trial court's order of consecutive sentencing under the same *Bise* abuse of discretion

with a presumption of reasonableness standard by which we review its other sentencing determinations.  *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013).

In determining a defendant's sentence, the trial court is required to consider the following factors:

> (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

"[A] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."  *Id.* at 346.  The burden is on the Defendant to demonstrate the impropriety of her sentence.  *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

### A.  Kidnapping Mitigation Factor

The Defendant argues that the trial court failed to consider the following statutorily mandated mitigation factor in the aggravated kidnapping and especially aggravated kidnapping statutes: "If the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing."  Tenn. Code Ann. §§ 39-13-305 (b)(2); 39-13-304(b)(2).

The transcript of the sentencing hearing reflects that the Defendant argued that her release of the children unharmed should be considered as a factor in mitigation, and that the trial court implicitly rejected that proposed factor by finding that the only possible mitigation factor was the Defendant's drug impairment.  We conclude that the trial court acted within its discretion when it considered this mitigating factor but found it was of little

weight. That she left the children unharmed inside the vehicle when she fled on foot does not equate to her having voluntarily released the children unharmed and supports the trial court's finding that the mitigating factor did not carry great weight.

## B. Consecutive Sentences

The Defendant argues, and the State concedes, that the trial court imposed consecutive sentences under the dangerous offender classification without making adequate findings of fact. We agree.

A trial court has the broad discretion to impose consecutive sentences if it finds by a preponderance of the evidence that any one of the criteria in Tennessee Code Annotated section 40-35-115(b) is satisfied, including the one found by the trial court: that the defendant is a dangerous offender whose behavior indicates little to no regard for human life and no hesitation about committing a crime when the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). However, when the trial court bases consecutive sentencing upon the dangerous offender classification, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d, 933, 937-38 (Tenn. 1995). Merely reciting the *Wilkerson* factors, as the trial court did here, is not sufficient; the trial court must make detailed findings of fact in support of its decision. *See State v. Ragland*, No. 2024-00535-CCA-R3-CD, 2025 WL 1430579, at *6 (Tenn. Crim. App. May 19, 2025).

When a trial court fails to provide adequate reasons on the record for its imposition of consecutive sentences, we have the following options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the consideration required under *Wilkerson* involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing under the dangerous offender criterion. *Id.*

We find that the record is sufficient for this court to conduct de novo review of consecutive sentencing. Any of the criteria listed in the consecutive sentencing statute is a sufficient basis for the imposition of consecutive sentences. Because the record supports the imposition of consecutive sentences based on the Defendant's having been on probation at the time she committed the crimes, we need not remand to the trial court for further findings in support of the *Wilkerson* factors. *See* Tenn. Code Ann. § 40-35-115 (b)(6).

Accordingly, we affirm the Defendant's convictions and the effective thirty-year sentence imposed by the trial court.

## **CONCLUSION**

Based on our review, we affirm the judgments of the trial court.


S/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE